DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT
*July Term 2014*

**E.H.,** the mother,
Appellant,

v.

**DEPARTMENT OF CHILDREN AND FAMILIES,**
Appellee.

No. 4D14-551

[September 10, 2014]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Martin County; Lawrence Mirman, Judge; L.T. Case No. 2013-DP-000072.

Antony P. Ryan, Regional Counsel, and Richard B. Kaplan of the Office of Criminal Conflict and Civil Regional Counsel, West Palm Beach, for appellant.

Karla Perkins, Miami, for appellee.

GERBER, J.

The mother appeals from the circuit court's final order adjudicating her child to be dependent. She argues that the order was not supported by competent, substantial evidence. We disagree with the mother's argument and affirm.

The Department of Children and Families ("the Department") filed a petition for dependency shortly after the child was born. The petition alleged that the child had been abused, abandoned, or neglected, or was in imminent danger of illness or injury as a result of abuse, abandonment, or neglect. The petition more specifically alleged that the parents engaged in multiple domestic violence incidents; the mother had untreated mental health issues; the mother had another child removed from her care after she heard voices telling her to shake the child; and the mother was unemployed and had been evicted from her home.

The father consented to an adjudication of dependency. The court accepted his consent and entered an order adjudicating the child

dependent as to the father, setting the matter for a hearing as to the mother, and accepting the case plan. The case plan contained tasks for both the mother and father to complete. As to the mother, the case plan required her to complete a psychological/parental capacity evaluation; complete a batterer's intervention evaluation; participate in parenting education classes and follow all recommendations; and complete a comprehensive mental health/substance abuse/anger management assessment and follow all recommendations. The case plan noted that the mother recently was arrested for aggravated assault on the father and was released after the father indicated he did not want the charge pursued.

The hearing proceeded as to the mother. The mother testified as follows:

- She received treatment for mental health illness when she was a child, but she believed nothing was wrong with her then or since.

- Approximately four years before the trial, the Department took her first child away following allegations that she said she was going to kill the child and that she heard voices telling her to shake the child. She claimed she never made such statements and that her aunt lied to the Department after they got into an argument. The mother ultimately was involuntarily committed under the Baker Act. As part of her case plan, she was required to take medication. However, she never did so. She claimed that she faked having a mental illness only to get a government assistance check.

- While she was pregnant with the child who is the subject of this case, the father went to jail after he "pulled [her] hair and spun [her] around." Another time, the father hit and choked her, and she pressed charges against him. She got back together with the father because he is the baby's father and she does not hold grudges.

- After she gave birth to the child who is the subject of this case, she and the father stayed at the hospital because the child was born prematurely. The mother denied getting into arguments with the father at the hospital, explaining that the father talked loudly.

- After the mother left the hospital, she went to live with a man who was not the father. She had lived off and on with the man before the child was born. At some point, she made a complaint to the police that the man had "touched on" her. However, after the child was born, she considered the man's home to be a good home for her and the child because the man "don't mess with kids." She had no furniture at the man's house for the

2

child.  She explained that she was going to live with her sister after the child was born, but her sister was evicted and all of the child's furniture and supplies were thrown out.

• While the father was visiting her at the man's house, she got into an argument with the father about baby photos which had been erased from her camera.  She tried to call 911, but the father got the phone.  A struggle ensued, during which she grabbed a knife and the father pulled it, cutting his hand.  She went to jail for domestic battery.  She downplayed the incidents of violence between her and the father, saying they got into an argument once or twice.

• At the time of the trial, she was homeless and lived with the father in a tent in the woods.  She went to a charity where she received food, clothes, and a place to shower.

A security officer from the hospital at which the child was born also testified.  The officer testified that while the child was in the hospital, he overheard a loud argument between the parents.  Concerned that the argument would escalate into violence, he asked one of them to leave, and the father left.  After the incident, the parents were not allowed to remain in the hospital room.

Also testifying was a senior mental health practitioner who performed an assessment of the mother.  She told the practitioner that she felt depressed and admitted to hearing voices when she was younger.  She denied any domestic violence between her and the father.  She was vague regarding living arrangements for her and the child.  She lived on and off with her sister, but indicated that her sister was being evicted.  There were concerns regarding schizophrenia and auditory hallucinations, meaning voices telling her what to do.  She was diagnosed as schizophrenic and bipolar, and she was prescribed medications to address these issues.  The practitioner opined that the mother had a mood disorder with a violent component, explaining that she lets everything build up inside and then it all comes out at once.  He believed the schizophrenia was in remission.  He recommended that the mother complete a psychiatric evaluation, individual counseling, parenting education, and that the Department look closely at the home situation for possible violence.  He thought with services in place, the child could be safe in the home.  However, he admitted that he knew very little about the dynamic between the mother and the father before the assessment.

The case manager also testified.  The mother admitted that she is depressed, that she and the father have big arguments, and that a

domestic violence incident occurred when she was pregnant. The mother said that she does not want to stay with the father because he is not a good father for the child and uses drugs. The case manager reviewed the services available to the mother and made referrals. The recommended services included parenting classes; a domestic violence assessment because of the incidents of domestic violence and the parents' criminal background; and a mental health assessment because the mother had another child removed after she heard voices, was not taking her medication at the time, and had last used medication two years earlier because she did not feel she needed it. The mother understood the services offered and said she was ready to cooperate to get her child back. However, the mother did not follow through on any of the referrals. The mother told the case manager that her attorney instructed her not to do anything until further notice. The day before the trial, the case manager visited the mother at the house of the man who is not the child's father. The father was present. The case manager observed that the mother was loving, patient, and caring with the child. The mother sleeps on the sofa at the man's house.

Also testifying was the man with whom the mother was living from time to time. He met the mother when she was pregnant and living in a tent. At some point, the father was in jail. The man invited her to live with him because of her situation. After she gave birth, she went to her sister's house and then came to stay with him. He was present when the parents got into an argument about erased pictures on a phone. The mother tried to call 911 and then picked up a knife. The father got cut when he tried to take it from her. If the mother and child were reunified, they could move in with him. He has a sleeper sofa but no furniture or supplies for the child.

In closing arguments, the Department argued as follows. The mother has untreated mental health issues which already affected the parenting of her older child. While she was pregnant with the child who is the subject of this case, domestic violence occurred. The mother was homeless at the time of the shelter. Services were offered and referrals were made, but the mother did not take them. The Department asked the court to find the child dependent as to the mother and enter a case plan with the tasks suggested by the mental health practitioner and the case manager.

The mother's attorney argued that the child was not present during any of the domestic violence, and that the child had not been abused.

After the trial, the court entered a written order of adjudication and acceptance of case plan as to the mother. In the order, the court

4

summarized the testimony of the mother and the other witnesses, and then made the following findings:

> [The mother] suffers and has suffered from mental illness.
>
> . . . .
>
> [The mother's] perception of events and recollection are warped, consistent with mental illness.
>
> . . . .
>
> [The mother] has impaired judgment and suffers from a mood disorder. Her impaired judgment and mood disorder affect her ability to assess the propriety of her relationship with the father . . . .
>
> There is a nexus between [the mother's] mood disorder and placing herself, [and] thereby the child, [in proximity] to acts of violence. There is a clear and present danger that the child will be harmed.
>
> The Court finds by a preponderance of the evidence that there has been domestic violence. Domestic violence is presumed to negatively mentally affect a child. The Court finds by a preponderance of the evidence that [the mother] suffers from a mood disorder. Based on a preponderance of the evidence, there is strong evidence, competent evidence to establish a nexus between [the mother's] mood disorder and these events occurring because of her impaired judgment, placing the child at risk of domestic violence effects, her lack of ability to maintain employment and stable housing.
>
> "Abuse" means any willful act or threatened act (because of impaired judgment and mood disorder allowing situation violence with the father) that results in any physical[,] mental, or sexual abuse, injury, or harm that causes or is likely to cause the child's physical, mental, or emotional health to be significantly impaired.
>
> The Court is making no findings as to the events that transpired between [the mother] and [the man with whom she was living from time to time].

> The Court does find that [the mother] is loving with her child and has a bond with her child. She testified that she is willing to engage in services and do what is needed to reunify with her child.

The order directed the Department to maintain custody of the child and that the previously-accepted case plan would remain in effect.

This appeal followed. The mother argues no competent, substantial evidence existed to show that the child was "at substantial risk of imminent abuse." § 39.01(15)(f), Fla. Stat. (2013). The Department responds competent, substantial evidence existed to show that the child was at substantial risk of imminent abuse based on the mother's untreated mood disorder with a violent component and the history of domestic violence between the mother and the father.

We employ a mixed standard of review. *See C.A. v. Dep't of Children & Families*, 958 So. 2d 554, 557 (Fla. 4th DCA 2007) ("A court's final ruling of dependency is a mixed question of law and fact and will be sustained on review if the court applied the correct law and its ruling is supported by competent substantial evidence in the record.") (citation omitted).

We conclude competent, substantial evidence existed to show that the child was at substantial risk of imminent abuse. Abuse means "any willful act or threatened act that results in any physical, mental, or sexual abuse, injury, or harm that causes or is likely to cause the child's physical, mental, or emotional health to be significantly impaired. Abuse of a child includes acts or omissions." § 39.01(2), Fla. Stat. (2013). Harm, in turn, occurs "when any person . . . [i]nflicts or allows to be inflicted upon the child physical, mental, or emotional injury." § 39.01(32)(a), Fla. Stat. (2013). "'Imminent' encompasses a narrower time frame and means 'impending' and 'about to occur.'" *C.A.*, 958 So. 2d at 560 (citation omitted).

Here, the Department presented competent, substantial evidence that the mother has an untreated mood disorder with a violent component towards a child. As the mother testified, approximately four years before the trial, the Department removed her first child following allegations that she said she was going to kill the child and that she heard voices telling her to shake the child. "[W]here a nexus is shown between the parent's mental disorder and a significant risk of danger to the child(ren), the trial court is not required simply to wait idly until the abuse . . . occurs before adjudicating dependency." *E.M.A. v. Dep't of Children & Families*, 795 So. 2d 183, 187 (Fla. 1st DCA 2001). The mother's lack of recognition of this

mood disorder and her lack of participation in offered services only exacerbates the significant risk of danger to the child.

The Department also presented competent, substantial evidence of multiple domestic violence incidents between the mother and the father, including while the mother was pregnant and after the child was born. The mother continued to engage in a relationship with the father, despite the apparent volatile nature of their relationship. This evidence established a substantial risk of imminent abuse of the child given the likelihood of such violence continuing. *See In re K.B.*, 937 So. 2d 709, 711 (Fla. 2d DCA 2006) ("[W]hen there is a history of domestic violence and the parents' relationship is ongoing, prior incidents of domestic violence can support a finding that a present threat of harm exists."); *R.M. v. Dep't of Children & Families*, 886 So. 2d 329, 332 (Fla. 5th DCA 2004) ("[G]iven the mother's willingness to put herself in harm's way and the father's propensity for violence no matter who is present, we conclude that the trial court correctly applied the law in declaring [the child] dependent . . . ."). This case perhaps presents a greater risk than that presented in *R.M.* because here, the Department's evidence indicated that both the mother and the father, and not just the father, have engaged in domestic violence.

Based on the foregoing, we conclude that the circuit court did not err in adjudicating the child to be dependent as to the mother. We conclude without further discussion that the mother's remaining arguments lack merit.

*Affirmed.*

WARNER and LEVINE, JJ., concur.

\*          \*          \*

***Not final until disposition of timely filed motion for rehearing.***

7