DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**J.D.,** the mother,
Appellant,

v.

**DEPARTMENT OF CHILDREN AND FAMILIES**
and **GUARDIAN AD LITEM PROGRAM,**
Appellees.

No. 4D18-2432

[January 2, 2019]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Alberto Ribas, Jr., Judge; L.T. Case No. 2018-905CJ-DP.

Antony P. Ryan, Director, and Paul O'Neil, Assistant Regional Counsel, Office of Criminal Conflict and Civil Regional Counsel, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Carolyn Schwarz, Assistant Attorney General, Fort Lauderdale, for appellee Department of Children and Families.

Thomasina Moore, Statewide Director of Appeals, Florida Statewide Guardian ad Litem Office, Tallahassee, and Aislynn Thomas-McDonald of Hershoff Lupino & Yagel, LLP, Tavernier, for appellee Guardian ad Litem Program.

FORST, J.

J.D. ("the mother") appeals an adjudication of dependency as to her two children. She argues that neither the facts nor law support the trial court's determination. As explained below, we affirm.

## Background

The events leading to the petitions for dependency are as follows. The mother was taken to the hospital by ambulance, complaining of pregnancy-related bleeding. She left her seventeen-month-old child at

home with her boyfriend's family. Her boyfriend had gone to a party the night before and not yet returned.

The mother, who was eight months pregnant, initially told hospital staff that her boyfriend beat her with a belt and with his hand "[a]nywhere it landed." She also informed the staff that she was worried her boyfriend's family would not feed her elder child. Hospital staff informed the mother that they were calling the police, and the mother asked them not to and began to recant her allegations.

The police arrived at the hospital and spoke to the mother with hospital staff present. She told a sheriff's office investigator that "she was scared for her life" and was "concerned for her child's safety with her boyfriend." Another officer observed bruises on the mother including one on her temple. She told the officer that her boyfriend had slapped her on her face after coming home drunk from a club. She mentioned he had been arrested for one such incident of domestic violence. Upon learning the officer was going to arrest her boyfriend, however, the mother again recanted her allegations.

A Child Protective Investigator ("CPI") spoke to the mother regarding the domestic violence and the concern for the elder child. The mother stated that her boyfriend was only hitting her and not the child "so it was okay." The mother also indicated that her boyfriend needed to be in the home to take care of the child. The CPI told the mother that the elder child needed to be removed from the care of her boyfriend's family and asked if she had family in Florida that could care for the child. The mother said that she did not have relatives in Florida and that her family lived in Haiti. The mother stated that she wanted the child to stay with her boyfriend while she was hospitalized. When the CPI informed the mother that her boyfriend was being arrested, the mother became hysterical. The CPI attempted to redirect the mother to the concerns for the elder child's safety to no avail. Because the mother was being hospitalized and because she reported having no relatives to care for the child, the elder child was sheltered. It eventually came to light that both of the mother's parents lived in Fort Lauderdale.

The Department of Children and Families (DCF) filed for dependency, alleging the mother had neglected the elder child and placed both children at substantial risk of harm, abuse, and neglect. At trial, the mother testified that she reported abuse out of jealousy. She explained: "But this is not true. I also told them that he hit [the elder child] and this is not true. But I was just upset because he had left me pregnant and I didn't know whether he was out with another woman." The sheriff's office

investigator and hospital social worker denied the mother had reported any physical abuse of the elder child, and no one from the hospital testified otherwise. The social worker did report that the boyfriend once dismantled the elder child's crib and forced her to sleep on the floor.

The trial court concluded that the children had been neglected and inferred "a pattern, a cycle of violence in the home which poses a threat of harm to both children" and that the mother's expressed desire to continue to live with her boyfriend placed "the children at imminent risk of abuse and neglect." In reaching this conclusion, the trial court found that the mother's own admissions, corroborated by other witnesses' testimony, established there was ongoing domestic violence in the home—including earlier in the mother's pregnancy. The trial court also determined that the mother's reports of domestic violence, while seeking medical attention, were more credible than her recantation upon learning her boyfriend would be arrested. Based on her own admission, the mother relied on the boyfriend financially and to help care for the children. She was scared and concerned for losing her boyfriend's financial assistance and would have reason to recant her statements.

The court also found that testimony from the police "proves [the] mother's own admissions" that the boyfriend had hit the elder child. It also noted that no actual abuse needed to be proven or even that the children were present or aware of the domestic violence. Accordingly, the trial court found the children dependent and placed them with their maternal grandmother, with a case plan goal of reunification.

## Analysis

In a dependency proceeding, DCF must establish its allegations by a preponderance of the evidence. *In re M.F.*, 770 So. 2d 1189, 1192 (Fla. 2000). A court's final ruling of dependency is a mixed question of law and fact and will be sustained on review if the court applied the correct law and its ruling is supported by competent substantial evidence in the record. *Id.*; *see also E.H. v. Dep't of Children & Families*, 147 So. 3d 616, 620 (Fla. 4th DCA 2014). The evidence presented is "[v]iewed in the light most favorable to sustaining the adjudication of dependency." *B.C. v. Dep't of Children & Families*, 846 So. 2d 1273, 1274 (Fla. 4th DCA 2003).

Initially, we note the trial court's finding that testimony from the police investigator "proves [the] mother's admission[]" that her boyfriend had hit the elder child is not supported by competent, substantial evidence. None of the witnesses testified that the mother had made such an accusation,

3

and DCF's answer brief does not contend that the boyfriend had physically abused the child.

Nonetheless, there is sufficient evidence in the record to sustain the adjudication of dependency which the trial court "based upon the Mother's neglect of the children and/or substantial risk of imminent abuse or neglect . . . ." It is not necessary to establish that the child saw or was aware of the domestic violence for a finding of neglect. *C.J. v. Dep't of Children & Families*, 968 So. 2d 121, 122 (Fla. 4th DCA 2007) (noting that the standard for "abuse" differs from "neglect," as domestic violence in the home constitutes child abuse only if the child is present); *see also* § 39.01(50), Fla. Stat. (2018) (defining "neglect," in relevant part, to occur "when a child is . . . permitted to live in an environment when such . . . environment causes the child's physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired").

We agree with the trial court that DCF presented competent, substantial evidence of several incidents of domestic violence directed by the boyfriend against the mother. Nonetheless, the mother continued the relationship with her boyfriend and recanted her prior reports of domestic violence in an effort to protect him. "[W]hen there is a history of domestic violence and the parents' relationship is ongoing, prior incidents of domestic violence can support a finding that a present threat of harm exists." *M.B. v. Dep't of Children & Families*, 937 So. 2d 709, 711 (Fla. 2d DCA 2006).

In *M.B.*, the Second District reversed the trial court's dependency determination, in part, because "the situation that gave rise to the domestic violence no longer exists, and the children are not exposed to a present threat of harm by continued acts of domestic violence." *Id.* at 712. The court noted "the evidence showed that the parents are currently living apart and both have begun relationships with others." *Id.* Here, in contrast, the mother testified that she still wanted to live with the boyfriend and relied on his financial support. She also recanted her accusations when faced with the arrest of her boyfriend, just after she had told hospital staff and law enforcement that her boyfriend had hit her numerous times while she was pregnant. As such, there is support for the trial court's conclusion that the children were exposed to "a present threat" of neglect.

## Conclusion

We are cognizant that the mother is a victim of domestic violence, not the perpetrator. Nevertheless, the primary purpose of a petition for

dependency is to protect the child, not to punish the caregiver. § 39.001, Fla. Stat. (2018); *A.B. v. Dep't of Children & Family Servs.*, 901 So. 2d 324, 327 (Fla. 3d DCA 2005). Based on the foregoing discussion, we conclude the trial court did not err in adjudicating the two children to be dependent as to the mother. DCF will engage with the mother to develop a case plan, with the goal of reunification of the mother with her children. Thus, this dependency action—unlike a TPR action—shouldn't be viewed as an ending, but rather, as a beginning.

*Affirmed.*

GERBER, C.J., and KLINGENSMITH, J., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***